UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

UNITED STATES OF AMERICA,                                            Plaintiff,

v.                                                Criminal Action No. 3:18-cr-119-DJH

VASUON DEION JAQUAN EBERHARDT,                  Defendant.

\* \* \* \* \*

## MEMORANDUM OPINION AND ORDER

Defendant Vasuon Deion Jaquan Eberhardt is charged with possessing a firearm as a convicted felon. (Docket No. 1) The charge arises out of a traffic stop for excessive window tint. Eberhardt has moved to suppress "all evidence obtained and statements made as a result of that stop." (D.N. 27, PageID # 49) The Court heard argument and testimony on the motion to suppress on August 13, 2019 (D.N. 44), and the parties submitted supplemental briefs and exhibits following the hearing. (D.N. 46; D.N. 49) After careful consideration, the Court will grant Eberhardt's motion.

**I.**

Eberhardt was pulled over after dark on February 11, 2018, by Louisville Metro Police Detectives McNeil, Probus, and Holland. Eberhardt and his passenger (identified in briefing as his girlfriend) had just come from the funeral of Eberhardt's sister, who was killed in a shooting. The officers were surveilling the funeral due to concern about possible retaliatory violence. They began following Eberhardt after being alerted by another officer that Eberhardt was related

1

to the victim and "wearing known gang colors."[1]  (D.N. 47, PageID # 118)  The stated reason for the stop was excessive window tint.

The stop took place in front of Eberhardt's home.  After pulling over, Eberhardt complied with McNeil's instruction to roll down the car windows and place his hands on the steering wheel.[2]  McNeil asked for Eberhardt's driver's license but would not allow Eberhardt to reach into the console to retrieve it.  McNeil twice asked Eberhardt whether he had anything illegal in the car, and Eberhardt replied, "No, sir."  (McNeil bodycam video (D.N. 46-1) at 00:40-1:45)  McNeil instructed Eberhardt to get out of the car.  Eberhardt complied.  Before frisking Eberhardt, McNeil asked whether he had a gun on him; Eberhardt again responded, "No, sir." (*Id.* at 1:45-57)  Eberhardt was then instructed to move to the rear of the car, where Holland was standing.  (*Id.* at 2:05-10)  McNeil asked multiple times for consent to retrieve Eberhardt's ID from the console; after suggesting that his mother could get it, Eberhardt consented.  McNeil opened Eberhardt's wallet and took out the driver's license and permit, then stood at the back of the vehicle, briefly asking Eberhardt's passenger about her criminal record.  (McNeil bodycam at 3:10-4:45)

While McNeil was retrieving Eberhardt's identification, Holland asked Eberhardt whether he was "on papers."  Eberhardt responded that he had been convicted of first-degree robbery.  (Holland bodycam video (D.N. 36) at 2:11)  As Holland was questioning Eberhardt, Eberhardt's mother appeared and asked what was going on.  This led to a discussion of Eberhardt's window tint and how the problem could be rectified.  (*Id.* at 2:23)  Holland said to

---

[1] Video of the stop shows that Eberhardt and his passenger were wearing airbrushed t-shirts bearing his sister's name and photograph.  The shirts appear to be white with pink.  The United States offered no additional evidence to support the assertion that Eberhardt was wearing gang colors.
[2] It is undisputed that Eberhardt complied with all of the officers' instructions.

2

Eberhardt's mother, "We're just stopping to talk to him; that's it." (*Id.* at 2:39) After brief further discussion of Eberhardt's criminal record, Holland asked Eberhardt whose funeral they had come from and what his relationship was to the victim. Holland offered condolences, then asked again, twice, whether there was anything in the car that would "get [Eberhardt] in trouble." Eberhardt again responded, "No, sir." (*Id.* at 3:20-4:13) Holland moved Eberhardt to the opposite side of the street, where the following exchange took place:

> Holland: "Look at me. Listen, I don't care; I understand you've gotta protect yourself. But if you lie to us . . . you're going to jail, okay. If there's a little bit of bud . . . I promise, it's not a big deal; we'll squash 'em and throw 'em out. You've been through enough. Is there maybe just a little bit of weed in there?"
>
> Eberhardt: "No, ain't no drugs in there at all."
>
> Holland: "Is there maybe a gun in there? It's not a big deal; I promise. I swear to God, it ain't a big deal. I understand, you've gotta protect yourself."
>
> Eberhardt: "My gun's in there."

(*Id.* at 4:12-38) Holland immediately handcuffed Eberhardt, informing him that he was "not under arrest" at that point, but merely "being detained." (*Id.* at 4:45) Holland then searched Eberhardt's car and found a gun under the driver's seat. (*Id.* at 5:05) Eberhardt was not read his *Miranda* rights until several minutes later. (*Id.* at 11:45)

Eberhardt argues that the stop was extended beyond its original purpose without reasonable suspicion and that he was subjected to custodial interrogation without *Miranda* warnings. (D.N. 27, PageID # 52-54; D.N. 49) The Court agrees on both counts.

## II.

### A.    Extension of Stop

A police officer may lawfully stop a motorist based on reasonable suspicion of an ongoing crime. *United States v. Collazo*, 818 F.3d 247, 253 (6th Cir. 2016) (citing *United States*

3

*v. Blair*, 524 F.3d 740, 748 (6th Cir. 2016)). Eberhardt does not challenge the stated basis for the stop, and the video evidence confirms that his car windows were heavily tinted. "Even if [the officers'] decision to stop [Eberhardt] for a traffic violation was a pretext to fish for evidence of other crimes, . . . 'the constitutional reasonableness of traffic stops [under the Fourth Amendment does not] depend[] on the actual motivations of the individual officers involved.'" *United States v. Everett*, 601 F.3d 484, 490 (6th Cir. 2010) (third and fourth alterations in original) (quoting *Whren v. United States*, 517 U.S. 806, 813 (1996)).

A traffic stop typically entails tasks such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Rodriguez v. United States*, 135 S. Ct. 1609, 1615 (2015) (citing *Delaware v. Prouse*, 440 U.S. 648, 658-60 (1979)). Officers may also ask questions regarding "matters unrelated to the justification for the traffic stop"; such questions "do not convert the encounter into something other than a lawful seizure, so long as [they] do not measurably extend the duration of the stop." *United States v. Stepp*, 680 F.3d 651, 663 (6th Cir. 2012) (quoting *Everett*, 601 F.3d at 490). To determine whether a stop was unreasonably prolonged, the Court must "consider[] both the duration of the extraneous questioning and its subject matter." *Id.* (citing *Everett*, 601 F.3d at 494). "[Q]uestions relating to travel plans, the driver's authority to operate the vehicle, or the safety of the officer"—e.g., questions about the presence of dangerous weapons—"do not bespeak of a lack of diligence." *Id.* (quoting *Everett*, 601 F.3d at 494-95); *see Everett*, 601 F.3d at 495. Even "some amount of questioning" intended "only to ferret[] out unrelated criminal conduct" is "permissible—so long as the officer's overall course of action during a traffic stop, viewed objectively and in its totality, is reasonably directed toward the proper ends of the stop." *Id.* If, on the other hand,

the totality of the circumstances, viewed objectively, establishes that the officer, without reasonable suspicion, definitively abandoned the prosecution of the traffic stop and embarked on another sustained course of investigation, this would surely bespeak a lack of diligence. So, too, if the circumstances establish that, over the course of the entire stop, "questions unrelated to the traffic violation constituted the bulk of the interaction between the [officer] and the [motorist]."

*Id.* (second alteration in original) (quoting *United States v. Peralez*, 526 F.3d 1115, 1121 (8th Cir. 2008)).

In *Everett*, the defendant was pulled over for speeding. When asked for his license, registration, and insurance, Everett "admitted that his license was suspended," and the police officer smelled alcohol on his breath. *Id.* at 486. After Everett stepped out of the car at the officer's request, the officer "asked him 'if he had anything illegal on his person, any weapons or narcotics or anything like that, or anything illegal in his vehicle.'" *Id.* at 487. Everett "responded that he 'had an open forty-ounce beer and a .410 shotgun, which . . . he knew he was not supposed to have because he was a convicted felon.'" *Id.* (omission in original).

The Sixth Circuit concluded that the officer's questioning of Everett "did not render the traffic stop an unreasonable seizure under the Fourth Amendment." *Id.* at 496. In reaching this conclusion, the court

> emphasize[d] that [the officer] asked only a single question before Everett confessed to possessing an illegal gun and an open container of alcohol, giving her probable cause to search the car. It cannot be said that this single question, in the situation [the officer] confronted, constituted a *definitive* abandonment of the prosecution of the traffic stop in favor of a *sustained* investigation into drug or firearm offenses. Nor did this single question, taking up several seconds, constitute the bulk of the interaction between [the officer] and Everett.

*Id.* at 495-96.

Here, in contrast, Eberhardt was asked the same questions repeatedly (and repeatedly answered in the negative) over a period of several minutes until he confessed—after Holland took him aside and "sw[ore] to God" that it would be "no big deal"—that there was a gun in the

5

car.³  (Holland bodycam video at 4:35)  The United States concedes that "[i]t is not clear from the evidence when, or if, anyone ran the license plate number on Eberhardt's vehicle" (D.N. 46, PageID # 111), and the bodycam videos confirm that none of the three officers undertook that task while Eberhardt was being questioned.  "[A]n officer may ask unrelated questions to his heart's content, provided he does so during the supposedly dead time while he or another officer is completing a task related to the traffic violation." *Everett*, 601 F.3d at 492 (citations omitted).  But here, none of the officers was taking any action "related to the traffic violation." *Id.*  Indeed, the videos reveal that Probus spent the relevant portion of the stop standing silently with his hands in his pockets.  (*E.g.*, McNeil bodycam video at 3:55-4:45)  Likewise, after McNeil retrieved Eberhardt's identification from the console, he did nothing with it, instead apparently waiting as Holland continued to question Eberhardt.  (*See id.* at 3:30-4:50)

In short, determining whether Eberhardt had a gun or other contraband appears to have been the officers' sole objective.  "[Q]uestions unrelated to" window-tinting "constituted the bulk of the interaction between" the officers and Eberhardt: Eberhardt was asked twice whether he had anything illegal before he was even instructed to exit his vehicle, and the same questions were asked repeatedly once he was out of the car, along with inquiries about his criminal history (which presumably were intended to establish that he was prohibited from possessing a firearm). (*See* D.N. 47, PageID # 128, 141)  The excessive-tinting issue was only addressed when it was raised by Eberhardt and his mother.  The extraneous questioning of Eberhardt thus "amounted to an unreasonable expansion of the initial stop," and "unless an independent reasonable suspicion of criminal activity arose during the course of the conversation with [Eberhardt], continuing to

---

³ Moreover, unlike Everett, Eberhardt was not suspected to be under the influence of alcohol or drugs.  *See Everett*, 601 F.3d at 495 ("While safety considerations are always relevant, they have even greater salience here, as Ford had grounds to suspect that Everett was intoxicated." (citing *Marvin v. City of Taylor*, 509 F.3d 234, 246 (6th Cir. 2007)).

6

hold [him] past that point amounted to a Fourth Amendment violation." *Stepp*, 680 F.3d at 664 (finding insufficient evidence that "the officers were reasonably diligent in pursuing their investigation of the [vehicle-]registration issue").

The United States maintains that there was reasonable suspicion to extend the stop on the basis of Eberhardt's "nervous demeanor."[4] (*E.g.*, D.N. 46, PageID # 111) The Sixth Circuit has repeatedly held, however, that "nervousness is 'an unreliable indicator, especially in the context of a traffic stop.'" *Stepp*, 680 F.3d at 665 (quoting *United States v. Richardson*, 385 F.3d 625, 630 (6th Cir. 2004)). Moreover, given that Eberhardt had been compliant in all respects since the beginning of the stop, any nervousness was not sufficient to give rise to reasonable suspicion that he possessed a weapon. *Cf. United States v. Bost*, 606 F. App'x 821, 825-27 (6th Cir. 2015) (finding reasonable suspicion where defendant ignored officer's instruction to exit the vehicle, instead reaching between the console and a child's seat in the front passenger seat). In sum, "the totality of the circumstances, viewed objectively, establishes that the officer[s], without reasonable suspicion, definitively abandoned the prosecution of the traffic stop and embarked on another sustained course of investigation." *Everett*, 601 F.3d at 495. This extension of the stop violated the Fourth Amendment.

**B.** *Miranda* **Warnings**

The statements and evidence must also be suppressed because Eberhardt was subjected to custodial interrogation without being given *Miranda* warnings. The United States failed to meaningfully respond to Eberhardt's argument on this point, only asserting briefly in its initial response to the motion that Eberhardt's statements were not made "as part of any custodial interrogation" (D.N. 34, PageID # 76) and noting in its supplemental brief that "the parties differ

---

[4] Having reviewed the bodycam footage, the Court observes that any nervousness on Eberhardt's part was not extreme or unexpected for an involuntary interaction with police.

to the extreme in their respective interpretations of whether the Defendant was in custody during the first five minutes of what was clearly a lawful traffic stop." (D.N. 46, PageID # 111)

*Miranda* warnings are required when a suspect is interrogated while in custody. *United States v. Woods*, 711 F.3d 737, 740 (6th Cir. 2013) (citations omitted). "Interrogation," in the *Miranda* context, encompasses "any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 740-41 (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)). The United States does not dispute that the questions asked of Eberhardt—"Is there anything illegal in the car?" "Is there a gun in the car?"—fall within this definition. Thus, the only issue for *Miranda* purposes is whether Eberhardt was in custody during the interrogation. *See id.*

Given the "noncoercive aspect of ordinary traffic stops," the Supreme Court has held that "persons temporarily detained pursuant to such stops are not 'in custody' for purposes of *Miranda*." *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984). The *Berkemer* Court declined to impose a bright-line rule applicable to all traffic stops, however. *See id.* at 441. Thus, "[i]f a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him 'in custody' for practical purposes, he will be entitled to the full panoply of protections prescribed by *Miranda*." *Id.* at 440 (citing *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam)). In other words, the *Berkemer* holding is limited to "ordinary traffic stops." *Id.*

The Supreme Court identified "two features of an ordinary traffic stop" that "mitigate the danger that a person questioned will be induced 'to speak where he would not otherwise do so freely'":

> First, detention of a motorist pursuant to a traffic stop is presumptively temporary and brief. A motorist's expectations, when he sees a policeman's light flashing

behind him, are that he will be obliged to spend a short period of time answering questions and waiting while the officer checks his license and registration, that he may then be given a citation, but that in the end he most likely will be allowed to continue on his way. In this respect, questioning incident to an ordinary traffic stop is quite different from stationhouse interrogation, which frequently is prolonged, and in which the detainee often is aware that questioning will continue until he provides his interrogators the answers they seek.

> Second, circumstances associated with the typical traffic stop are not such that the motorist feels completely at the mercy of the police. . . . [T]he typical traffic stop is public, at least to some degree. . . . This exposure to public view both reduces the ability of an unscrupulous policeman to use illegitimate means to elicit self-incriminating statements and diminishes the motorist's fear that, if he does not cooperate, he will be subjected to abuse. The fact that the detained motorist typically is confronted by only one or at most two policemen further mutes his sense of vulnerability. In short, the atmosphere surrounding an ordinary traffic stop is substantially less "police dominated" than that surrounding the kinds of interrogation at issue in *Miranda* itself and in the subsequent cases in which we have applied *Miranda*.

*Id.* at 437 (quoting *Miranda v. Arizona*, 384 U.S. 436, 467 (1966)) (citations and footnotes omitted). The Court further noted that

> [t]he brevity and spontaneity of an ordinary traffic stop also reduces the danger that the driver through subterfuge will be made to incriminate himself. One of the investigative techniques that *Miranda* was designed to guard against was the use by police of various kinds of trickery—such as "Mutt and Jeff" [i.e., "good cop/bad cop"] routines—to elicit confessions. A police officer who stops a suspect on the highway has little chance to develop or implement a plan of this sort.

468 U.S. at 439 n.27 (internal citation omitted); *see id.* at 433 (explaining that one of the "purposes of the safeguards prescribed by *Miranda* [is] to *ensure* that the police do not coerce or trick captive suspects into confessing").

This case does not present the "ordinary traffic stop" contemplated in *Berkemer*. First, the stop was not "spontane[ous]," *id.*: the officers began following Eberhardt not because of a traffic violation, but as part of surveillance they were conducting on the funeral he had just attended. It occurred at night, on a street with no significant traffic during the several minutes

preceding Eberhardt's arrest. *Cf. id.* at 438. There were three officers involved in the stop, as opposed to "one or at most two." *Id.* And the officers showed virtually no interest in the claimed purpose for the stop, embarking on a sustained course of questioning about whether there was anything illegal in the car without bothering to check Eberhardt's license or registration. *Cf. id.* at 437. As Eberhardt continued to deny that he had anything illegal, Holland kept asking the same questions, demanding, "Look at me." Holland finally pulled Eberhardt across the street, away from his mother and his girlfriend, to attempt to elicit an incriminating response by promising to "squash" any marijuana Eberhardt might have in the car and assuring him it was "no big deal" if there was a gun because Holland understood that Eberhardt had to "protect [him]self." (Holland bodycam at 4:12-38)

Under these circumstances, *Miranda* warnings were required. Although the stop took place on a public street, the presence of three armed officers, including one who merely stood nearby while Eberhardt was questioned, contributed to a "police dominated" atmosphere. *Berkemer*, 468 U.S. at 439. Holland's act of "isolating [Eberhardt] from others, who might [have] len[t] moral support . . . and thereby prevent[ed] inculpatory statements, was a technique of psychological coercion" that further supports a finding of custody. *United States v. Beraun-Perez*, 812 F.2d 578, 582 (9th Cir. 1987) (citing *Miranda*, 384 U.S. at 449-50, 455) (finding custodial interrogation where defendant was questioned in a remote area and his coworker was sent away by police). In light of the officers' refusal to accept Eberhardt's repeated denials that he had a gun, a reasonable person in his position would assume "that questioning w[ould] continue until he provide[d] [the officers] the answer they s[ought]." *Berkemer*, 468 U.S. at 438. And Holland ultimately engaged in "trickery" to elicit that answer, not just promising but

"swear[ing] to God" that a gun in the car was "not a big deal."[5] *See id.* at 433, 438 n.27. "Fidelity to the doctrine announced in *Miranda* requires that it be enforced strictly, but only in those types of situations in which the concerns that powered the decision are implicated." *Id.* at 437. This case presents one of "those types of situations." *Id.* Suppression is thus also warranted under the Fifth Amendment.

### III.

For the reasons set forth above, and the Court being otherwise sufficiently advised, it is hereby

**ORDERED** that Eberhardt's motion to suppress (D.N. 27) is **GRANTED**.

---

[5] Holland acknowledged during the suppression hearing that the penalties Eberhardt faces for possessing a gun are, in fact, "kind of a big deal." (D.N. 47, PageID # 143) He also acknowledged that he already knew Eberhardt was a convicted felon when he asked whether there was a gun in the car. (*See id.*, PageID # 128)